Judgment reversed and new trial granted, costs to abide the final award of costs.

BARTHOLD C. GAEDEKE, Respondent, v. THE STATEN ISLAND MIDLAND RAILROAD COMPANY, Appellant.

*Railroad — commissioners of highways of a town may impose a one-fare rate and transfer tickets as a condition of their consent.*

Commissioners of highways of a town whose consent to the construction of a railroad on such highways is made necessary by section 91 of the Railroad Law (Laws of 1890, chap. 565, as amd. by Laws of 1893, chap. 434), may, as a condition of granting such consent, properly require the railroad company to execute an agreement to transport passengers for a single fare between certain points, and to issue transfers to connecting lines; and where the railroad company takes advantage of the consent, a passenger, who is charged two fares in violation of the agreement, may maintain an action to recover the additional fare.

The consent of the highway commissioners was not made unnecessary by chapter 555 of the Laws of 1890, placing certain highways in the county of Richmond (the *locus in quo*) under the exclusive jurisdiction, for certain purposes, of the board of supervisors of the county, nor by the Highway Law (Laws of 1890, chap. 568).

APPEAL by the defendant, The Staten Island Midland Railroad Company, from a judgment of the Municipal Court of the city of New York for the borough of Richmond in favor of the plaintiff, entered in the office of the clerk of said court on the 31st day of May, 1899.

*Harcourt Bull*, for the appellant.

*John G. Clark*, for the respondent. .

HATCH, J.:

. The very full examination which this case received in the court below, and the able opinions delivered by the learned judge in the decision of this* and the *Cortelyou* case, require little to be said by us. We may safely rest our decision of this case thereon. It is, however, so earnestly insisted by the appellant that the clause in the contract, made by the defendant with the commissioners of the town of Southfield, is void, that we conclude to express our views thereon.

It is conceded that the railroad company applied to the commissioners for their consent to lay its tracks in the highway, and that

---

* The following is the opinion written by the judge in the court below:

REYNAUD, J.:

This case differs from the *Cortelyou* case, decided last year, in two main particulars.

The effect of chapter 555, Laws of 1890 (known as the County Road Act), is an issue distinctly raised, and, in addition, there is a modification in the stipulated facts.

In both cases the ride began at a point named Richmond, in the former town of Southfield. But in the *Cortelyou* case the physical transfer or break in the ride occurred at a point named Grant City in the same town, while in the present case that transfer or change of cars occurred beyond said town at the point named Concord, in the former village of Edgewater.

In each case, however, the passengers demanded transfer to the same destination for the single fare of five cents, first paid in both cases in the town of Southfield; and the temporary alighting and change of cars was in each case pursuant to the direction of defendant's agents and at the place indicated by the latter.

as a condition of giving such consent the railroad company agreed to transport passengers at a five-cent rate of fare between points named therein, and to issue transfers to any of its connecting lines through the Clove road for such fare. It also appears that the railroad company violated this agreement, although it took advantage

It is now also stipulated in effect that the entire ride (with the exception of the public highway known as the Richmond turnpike which is not covered by the contract with the supervisors of the county) was along what were known as county roads under chapter 555, Laws of 1890. It appears in substance under the stipulated facts that in the fall of 1895, and spring of 1896, the defendant's railroad was largely extended, reconstructed and converted into a connected electric street surface railroad, running through various towns, villages and localities in the county of Richmond; that pursuant to article IV of chapter 565, Laws of 1890, as then amended, the defendant made written application for public consent to the various local authorities of the towns and villages to be traversed by its railroad; that due publication and public hearings thereof were had, and finally public consent given by such respective local authorities, all embodied in written contracts, executed by defendant with the highway commissioners of the town of Southfield, the highway commissioner for the separate road district of the town of Middletown, the board of trustees of the village of New Brighton, and the board of trustees of the village of Edgewater, and all as set forth in the stipulation herein. Also, pursuant to the so-called County Road Act (Chap. 555, Laws of 1890), the consent of the board of supervisors of Richmond county was sought and procured for certain of the same public highways as set forth in the written contracts with said supervisors referred to in the aforesaid stipulation.

It is now claimed by the railroad company:

1. That its contracts with the town or village officials were invalid and void, at least in so far as any of those contracts with said town and village officials purported to contain covenants in respect of fare and transfer beyond their respective territory.

2. And further, that those contracts were *wholly* void because, although the public streets concerned were within their territory, these local officials had lost all jurisdiction over such streets and had no longer any power or function in the premises, by reason of the so-called County Road Act under which those public streets had then become county roads.

In regard to the first question: I have already in the *Cortelyou* case expressed the opinion that the conditions as to fare and transfer agreed upon by defendant by its covenants with the local officials were legal and binding. I am unable to accept the view that the local authorities, as depositaries of the right to give or refuse the public consent to railroads on public streets, are limited to a mere naked yea or nay. This was fully considered in the *Cortelyou* case. (*People ex rel. West Side St. R. Co.* v. *Barnard*, 110 N. Y. 548, 553, 557.)

But further, and at any rate it seems to me beyond question, that they are proper recipients of covenants for the public benefit solemnly executed by the railroad company itself in view of such public consent. The rate of fare and

of the consent, laid its tracks, is operating its cars, and collects fares of passengers transported thereon.

The defendant is a street surface railroad corporation, organized under the General Act of 1884 (Chap. 252). The contract which it made with the commissioners of highways of the town of South-

---

right of transfer from points beyond the town or village were proper elements of consideration and proper covenants of inducement for the public advantage on the part of the applicant to undertake ; and such covenants as defendant may in fact have so solemnly undertaken and agreed to perform, I believe to be clearly binding upon it to carry out.

It is urged with great earnestness that these local authorities in themselves are as such of very limited powers. Their contracts when beyond their express powers in any respect have been wholly avoided by the courts. This is all very true, and I have some familiarity with the cases cited in that regard and particularly when their acts were sought to charge the public body represented by them with pecuniary obligations. But the argument seems to me to miss entirely the special function conferred upon them under the provisions of the Railroad Law. They are in that respect the designated depositaries of the public consent as to the use of the public streets and highways for street surface railroad purposes. And they have equally therefor all the powers which should properly attach to the exercise of such a function. That is an aspect of their office (such as it may otherwise be) which defendant's argument seems to me to slight or neglect.

At the time here concerned the statute giving effect to the constitutional provision in regard to the local authorities or depositaries of the public consent for street railroads was as follows :

"In cities the common council, acting subject to the power now possessed by the mayor to veto ordinances; in villages, the board of trustees, and in towns the commissioner or commissioners of highways, *shall be the local authorities referred to ; if in any city* the exclusive control of any street, avenue or other property which is to be used or occupied by any such railroad, is vested *in any other authority,* the consent of such authority *shall also* be first obtained." (§ 91, art. IV, chap. 565, Laws of 1890, as amd. in 1893 [Chap. 434] and 1895 [Chap. 545].)

Unless this statutory provision is in itself unconstitutional the functionaries designated by it became the proper persons to entertain, consider and determine the granting or withholding of the public consent concerned. And they respectively possessed all the powers which are properly incident to that function. The defendant so treated them by due application ; and the public hearings and the contracts in evidence followed. I fail to see that in so doing the defendant then erred in considering them as the local authorities designated by the express terms of the statute. And if they were such, I am unable to see how covenants on the part of defendant which were reasonable in nature and apt to conduce to the public advantage, as to the facilities (including the charge therefor) which defendant's railroad would afford to or from any indicated points of travel, can be considered illegal and void. In the absence of any statutory or other provisions of

field was made and executed on the 30th day of December, 1895. By chapter 434 of the Laws of 1893, section 91 of the General Railroad Law (Laws of 1890, chap. 565) was amended so as to require the railroad company to obtain the consent of the commissioners of highways of the town where it was sought to acquire the right to construct its

law which invalidate such covenant as defendant may have entered into in that regard, in consideration of the grant of the public consent, that covenant must stand in full force and effect. (See opinion in *Cortelyou* case.)

This brings us to the second point which is now presented with great force and ingenuity. That is that these town and village authorities had lost every function and power in respect to the public streets concerned because those streets and highways had become county roads under the terms of chapter 555, Laws of 1890. It would follow that the transactions with them, including defendant's applications, public hearings, consent and written contracts were absolutely futile and empty performances.

Although intricate and somewhat startling in result, the position deserves consideration.

At the time concerned, a statute (Chap. 555, Laws of 1890) provided for the improvement of public streets in this county to be termed county roads. It prescribed, among other things, that no street surface railroad should be constructed upon such improved county roads without the consent of the board of supervisors. At that time, in another connection, an amendment to what is known as the Highway Law also provided as follows:

"§ 58. The county road in any county shall be exclusively under the jurisdiction of the board of supervisors and the county engineer of the county, and exempt from the jurisdiction of the highway officers or officers performing the duty of highway commissioners of the several towns and villages in which such county roads are located." (Laws of 1890, chap. 568, as amd. by Laws of 1895, chap. 375.)

The ride in suit was in the main (with the exception of the Richmond turnpike, which is not included in the supervisors' consent to defendant) along county roads under the aforesaid act. I think I have, in substance, indicated the full force of the difficulty. But it seems to me that the argument based upon it overlooks the fact of the co-existing provision of the Railroad Law already cited which at that time also provided in regard to the local authorities who were to be the depositaries of the public consent for street railroads, to wit, section 91, the Railroad Law, as amended in 1895 and 1896.

One function at least was, therefore, still expressly delegated to these town and village officials in regard to the public streets and highways within the town or village; and that was the fundamental function, so far as defendant is concerned, as to the giving or withholding of the public consent. The two statutes are easily reconciled by requiring *both* consents; that of the local authorities and that of the county officials. But it is by no means a logical result that the statutory requirement of the latter excludes and abates the equal requirement of the former. It might indeed on the contrary follow (as is seemingly intended by

# GAEDEKE v. STATEN ISLAND MIDLAND R. R. CO. 519

App. Div.]     SECOND DEPARTMENT, OCTOBER TERM, 1899.

railroad upon the highways of such town, and this provision now remains the law.   It was pursuant to this requirement that the defendant applied for and obtained the consent of the commissioners and executed the contract.   The defendant now says that this was an unnecessary proceeding; that such consent was not required, and

subsequent legislation) that where there is *other* authority over the public streets the *same* preliminaries as to application, publication, first public hearing, etc., shall *additionally* be had.   At any rate my opinion is that the express provision of section 91 of the Railroad Law in designating the stated local authorities, in pursuance of the Constitution, were not abrogated by the County Road Act nor by the Highway Law.   However this may be, so far as this case is concerned, one fact seems to dispose of the question.   Assuming the contract with the county officials (the board of supervisors) to be the controlling instrument here, the 5th clause of that contract ("Exhibit J") is as follows:

"*Fifth.* Said Railroad Company covenants and agrees that it will perform and keep each and every of the covenants and agreements made and entered into with the several local authorities which have granted consents to the construction of said railroad, pursuant to Article IV of the Railroad Law, affecting any of the roads, streets, avenue or public places for which the consent of the said Board of Supervisors is hereby given."

Here again the contract not only imposes upon defendant the terms already stipulated, but the latter repeats its covenant to carry out the obligations undertaken by it with the various local authorities.   It is as though these terms (however otherwise valid or invalid) had *de novo* and in full been repeated and agreed to by defendant.   Under the stipulated facts the reference is sufficiently plain, and, it seems to me, conclusive of the question in this case.

Now, in the Southfield contract with the highway commissioners of that town, the defendant had covenanted as follows:

"*Seventh.* It is further agreed that the fare charged by said railroad company shall not exceed five cents between any points within said town; and further that the fare between Richmond and St. George and intermediate points on the company's line shall be five cents; and the company agrees to furnish transfers to any of its connecting lines through the Clove Road from any points in the within grant or route for a single fare of five cents."

My conclusion is that, under every legal consideration, the defendant must be deemed to have lawfully covenanted with the Southfield commissioners for the public advantage, in consideration of the public consent which it received for its railroad, to carry the plaintiff through the ride concerned in this case for the single fare of five cents; and that it had no right in law to exact the extra fare collected.

In view of the urgency of counsel to facilitate a review of this case which was submitted on May twenty-ninth, there is no time to abridge this opinion to a more concise statement.

Judgment for plaintiff for five cents and costs.

that the contract is void; and this for the reason that by chapter 555, Laws of 1890, the county roads of the county of Richmond were placed under the exclusive jurisdiction of the board of supervisors of the county. This claim is only partly true. Examination

---

The following is the opinion written in the *Cortelyou* case:

REYNAUD, J.:

The defendant, a street surface railroad corporation, entered into certain contracts with the various local authorities who had the power to grant or refuse consent to the construction and operation of the railroad. Among other covenants are some in regard to transfers and in regard to the fare for which defendant agreed to carry passengers. In other words, irrespective of the power of the local authorities to impose the stipulated conditions *compulsorily*, we have here the affirmative agreement of the defendant company, embodied in contracts in writing and under seal. What the particular clauses specifically provide will be later examined. Counsel, by stipulation, have submitted several broad and general questions. The main one argued, as to the validity of these agreements, may be answered first.

I have been unable to understand on what theory these covenants, such as they are, could be deemed invalid. As already noted, this is not a case of conditions imposed by public authorities and *rejected* by the proposed grantee. Nor is it the case of a grant or consent received *under protest* in which the grantee accepted the consent but reserved the right to refuse the alleged illegal conditions. There is no claim of any such protest, but on the contrary here is the express agreement by the defendant company that it will do certain things as part and parcel of the grant or consent. For all that appears it might have been the original proposition of the company itself to induce public approval and to prevent rival applicants from securing the rights which it solicited. At the public hearings contemplated by law this may have been a controlling element in the offers of defendant which brought about the coveted consent and without which the application would have been immediately negatived. At any rate here it is embodied, not in a protest or reservation of right, but in what must be deemed the free act and contract of the defendant solemnized with its seal.

What strikes the mind at the outset in regard to these covenants, such as they may be, is that the attempt to impeach them seems a breach of that good faith which courts should certainly seek to preserve and secure, and perhaps more emphatically so where public interests are involved. It seems a startling proposition that public authorities lack power to bind an applicant for public privileges to the obligations freely entered into by that applicant as a basis of the solicited privilege. The doctrine of estoppel could scarcely receive more appropriate enforcement than in such a case, where an essential moving cause of the consent on one side may precisely rest on the reciprocal covenant of the grantee itself on the other side.

That the company had power to contract in regard to its fare seems beyond question. It could so contract with an individual passenger by selling him a ticket or again by commutation books. It might do so in regard to a large num-

of that act shows that the jurisdiction vested by it was for the " purpose of improving and maintaining the road-bed thereof as a road or roads for carriages or other vehicles, but for no other purpose." (§ 1.) By section 7 of this act, the consent of the board of supervisors

ber of passengers, with some club, association or pleasure party. It could contract to that effect with another railroad or ferry corporation or with some other public body. It seems to me evident that it may legally do so in regard to the entire public by proper contract with the local authorities. Again, it would scarcely be pretended that the agreement to do so is void on the ground that it is against public policy. That would be a bold position to assume in respect of covenants so clearly tending to the public benefit as the voluntary limitation of the fare which the public shall be called upon to pay. Nor will it do to attack these contracts on the ground of lack of consideration. In the first place they are under seal, which itself imports a consideration. The law will not permit such an instrument to be impeached in that regard. The consideration may be sued for if not actually received; the true amount of the consideration may be inquired into; but the fact that there was a consideration to support the sealed instrument cannot be disputed. Secondly, upon their face the contracts express that they are entered into upon the faith of the mutual covenants therein, which again would itself be a good consideration. There are many terms and conditions as to the nature of the construction permitted, service, etc., which bind the local authorities as well as the company. Finally, viewed as contracts, the consents, grants and privileges embodied in the instruments constitute consideration.

A last objection is as to the capacity of the local authorities on their side to be parties to such covenants and obligations. It is true, no doubt, that the municipal authorities and the private corporation could not combine by any agreement to nullify limitations and restrictions already imposed by law in favor of the public. But there is nothing in the law, that I know of, which prevents their agreement upon still greater restrictions and limitations for the public advantage. The statutory provisions have no such purpose or effect. Not more so than they prevent the company from contracting, as already remarked, with a passenger for a lesser fare than the statute might otherwise permit. Take the case of a general railroad which under the statute could charge three cents a mile. The statutory provision does not in any way affect the perfect validity of the agreement by the railroad company to charge less. And so of other matters. Such provisions in the statute were intended to make sure that the public interest should be protected at least to the extent prescribed. The local authorities are barred from granting easier terms to the private corporation, but not from obtaining better ones.

The whole trend of public policy is toward exacting and expecting from official authorities the most favorable terms which they can get in return for the concession of public privileges. It would, indeed, be anomalous, when they have acted accordingly and have secured the agreement of the applicant itself to

to lay any surface railroad upon the roads of the county was to
be obtained, in addition to the requirements of existing laws.    By
section 10 the act reiterated the provision of section 1, that such
control by the board was only for the purpose of improvement and
keeping the roads in repair, except as expressly authorized other-

---

such terms, to hold their labors unlawful and void.   In my opinion all reason-
able conditions in favor of the public, thus accepted and agreed upon, which are
not repugnant to some positive prohibition of the statutes, are valid and binding.
Conditions for common use or common trackage; in regard to transfers between
various lines of the same railroad, or lines of other railroads; in regard to the
frequency of service; limitations as to the rate of fare; limitations as to the time
within which the railroad must be constructed — all these tend towards the pur-
pose of the statute and not against it, and they are, in my opinion, reasonable
and legal conditions and obligations properly undertaken by the railroad com-
pany in its contracts with the municipal authorities. -

Indeed, as I view it, these conditions are lawful and binding, not only as terms
stipulated by the covenants on the part of the applicant itself, but as terms which
the local authorities could impose of their own motion as conditions of their
assent..

Back of the statute lies the Constitution.   The statutory enactments in regard
to the local authorities are intended to enforce the constitutional provision which
practically prohibits railroads from being constructed and operated on public
streets and highways without the consent of the local authorities.   It seems a
very narrow and niggardly view of the scope and intent of that constitutional
provision to treat those authorities almost as dummies who can merely nod their
heads yea or nay, without voice as to the precise conditions of the proposed rail-
road.   These precise conditions may be essential considerations as to the public
advantage in the granting or refusal of the consent.   They become, so to speak,
part of the corporate features and character of the particular applicant.   Where
there are several applicants for the same consent, such conditions and considera-
tions may be the only reasonable factors besides mere favor or caprice for public
discrimination between them.   I am unable to understand why the public con-
sent may not itself be impressed with any reasonable conditions which are not
repugnant to some statutory enactment.   Perhaps the Legislature could limit
the constitutional prerogative to a mere yea or nay.   But certainly it should not
be deemed to have done so where it has not said so.

The Court of Appeals has stated this doctrine with great clearness and
emphasis.

In *People ex rel. West Side St. R. Co.* v. *Barnard* (110 N. Y. 548) one condition
imposed by the common council was, that the railroad company should carry for
a single fare of five cents, not only over its own railroad but over a line of another
railroad company.

The court says (at p. 553): " Under this act and under the constitutional pro-
visions applicable to the construction of street railways, the municipal authori-
ties have the absolute power to grant or withhold their consent to the construc-

wise by the act, " and for all other purposes the said roads shall remain and be subject to the authority, control and jurisdiction of the town, village, separate road district, or local authorities to which they shall respectively belong." It is quite evident that the authority conferred by this act upon the board of supervisors, and the authority

tion of street railways; and they may impose any conditions, however onerous and difficult to perform, which seem to them, in the exercise of their discretion, to be proper, as the terms upon which their consent will be given."

Again (at p. 557): " This was a condition which it could impose. It might be difficult for the company taking the grant to perform it; but it was not impossible to perform it because, under the statute, there was a way by which the relator could obtain the right to run upon the tracks of the East Side Street Railway Company which owned the road between Seneca street and one terminus of the route granted. If it should turn out that it could not comply with the terms of the grant in the respect mentioned, the result would simply be that it would be exposed to the forfeiture of its franchises and rights."

This language is all the more significant when it is remembered that the court thereby specifically reversed the ruling of the General Term in that regard. (See same case, 48 Hun, 63.)

The same doctrine has been repeatedly applied by the courts of other States in a variety of cases and conditions. (See Booth St. Ry. §§ 29, 30, 31, 47 and cases cited at p. 63; Dillon Mun. Corp. § 706; and see *Peekskill etc., R. R. Co.* v. *Village of Peekskill*, 21 App. Div. 94.)

The case of *Matter of Kings County Elevated R. R. Co.* (105 N. Y. 97) is not in conflict with these views. That was the case of a railroad under the Rapid Transit Act, where the Legislature expressly delegated to the commissioners appointed according to law the determination of the routes, the time for construction of each route and other conditions. The court held that the delegation in regard to the conditions so fixed was *exclusive;* that the scope and purpose of that act would be nullified by conflicting conditions, and that the latter were repugnant to the legislative provisions. It is to be noted, without other comments, that the same bench one year later expressed the views quoted above in the *West Side Street Railway Case* (110 N. Y. 548).

A distinction, however, is strenuously urged by counsel between the powers of the village trustees as to the village contracts and the powers of the highway commissioners as to the town contracts. Much ridicule is expended upon the latter officials for attempting to secure or receive covenants regarding the rate of fare even within the town; much more so where the covenant extends beyond the town limits. It seems to me a complete answer that they are equally named by the statute, in pursuance of the Constitution, as the respective local authorities to exercise the powers of permitting or preventing the construction and operation of the railroad. If I am right as to the scope and intent of these powers toward securing and receiving stipulated obligations for the public benefit, if either can, both can. Otherwise, neither can. The absurdity of a contrary conclusion will appear from its result. That would involve that in the village the

vested in the highway commissioners by section 91 of the General Railroad Law can both stand together and full effect be given to each. There is no inconsistency therein, and it becomes the duty of the court so to construe them as that both shall have effect. (*People ex rel. Kingsland* v. *Palmer*, 52 N. Y. 83; *Mongeon* v. *Peo-*

public interest could be thus subserved and in the towns not. For, as in the latter, the highway commissioners have exclusive power to give the consent, after they have acted, by simply saying yes, no further conditions could be secured. It is evident that the statute constituting them the local authorities in this respect intended to give them the same functions and the same powers.

As to the appropriateness of the stipulated covenants, ridicule seems misplaced. A most important consideration in determining whether to give consent or refuse it, is not simply the physical occupation of the streets by the railroad within the town, but what public facilities it will afford both *through and to and from the town.* In other words, in the largest sense, the public benefit to accrue from yielding the public highways to such a use. What are the questions which naturally present themselves to any intelligent and honest official expressly charged by law with the power to grant or refuse the public consent? What kind of a railroad? Reaching where? For what fare? To be built within what time? If such and such, yes. Otherwise not. Otherwise it will obstruct the public highways to no advantage. It will prevent others. It will prove, not a source of development and convenience, but of obstruction to the growth and interests of the community. These are precisely the considerations provided for in the contracts with these various officials. They seem to me eminently proper and lawful conditions and obligations undertaken by the defendant with the respective local authorities who had by law the power and authority to act in behalf of the public in regard to granting or refusing the public consent.

The only remaining question would seem to be as to the right of a private individual to bring suit, under the objection of lack of privity to the contract — in other words, that he is not a party to such contract, and that the municipal authorities are the only ones who can enforce it. It is too late in this State to attack the principle that a third party, with a direct interest in the result and for whose benefit by the *express contemplation* of the parties a contract is made, has such a right of action. Whether on the doctrine of trust or of agency, no more apt example could be suggested than in the case of public authorities, acting in behalf of the entire public, in a matter particularly affecting each individual thereof, and in which the public grantor can have no other lawful interest for the performance of the covenant than " that the covenant be performed in favor of the party claiming performance." (*Durnherr* v. *Rau*, 135 N. Y. 222; *Lawrence* v. *Fox*, 20 id. 268; *Little* v. *Banks*, 85 id. 263.)

The contract would be purposeless except as entered into for the benefit of plaintiff and others similarly circumstanced as fully as if their names were inserted therein. As such clearly contemplated beneficiaries it is enforcible by them. (Am. & Ency. of Law [2d ed.], title " Contracts," 107, and cases cited.) The case of *Wainwright* v. *Queens County Water Co.* (78 Hun, 146) is not in

*ple*, 55 id. 613.) If, however, there was complete repugnancy between the two acts, as the statute conferring power upon the highway commissioners was passed subsequently, the former statute would necessarily have to yield, as the last is the final expression of legislative intent. (*Pratt* v. *Munson*, 84 N. Y. 582.) We are not now

conflict with this conclusion. There a local fire organization obtained a contract from a water company to put up and supply a certain number of hydrants, the fire organization to pay $2,000 annually upon condition that the water company should maintain a certain pressure of water. The residence of the plaintiff, a private taxpayer, was burnt and he sued the water company for $30,000 on the ground that if the water pressure had been sufficient the fire would have been extinguished.

Without reference to the nature of the covenant in that case, which would seem limited to releasing the fire organization from paying the $2,000 rent, the court placed its decision on the ground that the fire district had no duty to secure water hydrants and water pressure. It had no duty towards the plaintiff or anybody else to provide or supply such water, and hence there was no relation between the individual taxpayer and the fire district which would enable the former to sue in that regard. Whether that ruling is right or not beyond the circumstances of that case, here, as I have tried to show, an essential element in the duty of the local authorities in regard to granting or refusing the solicited consent rested in the very considerations which became part of the contract. Here they were not entering into a private arrangement with a contractor to furnish certain material and a certain amount of water. They were granting, in behalf of the public, a public privilege and securing as a basis of their judgment in doing so, a fundamental condition that the public should not be charged more than a specified fare.

The *Wainwright* case, however, correct or otherwise, is not in point. A parallel case might have arisen if the local authorities had granted to some one the right to lay water mains in public streets on condition that the public should receive water therefrom at a specified rate. In such a case it seems to me that the public might be deemed the contemplated beneficiaries and could refuse, under such a contract, to pay more than the rate thus fixed by the authorities and the company.

Irrespective of the principles of *Lawrence* v. *Fox*, it seems to me that in relation to contracts of this character, entered into for the benefit of the public by the proper public authorities, the sound doctrine (allowing for any difference in the facts) is that essentially established in the case of *Little* v. *Banks*. Having made such a contract, assuming it to be valid, suppose defendant had carried the passenger, could the company sue for the extra fare? I think not. Public policy in the practical enforcement of such covenants requires that defendant should not be permitted by threat or otherwise to exact and retain what it thus had no lawful right to demand. As is well said in the *Banks* case: "The ground upon which these decisions are founded is a broad principle of public policy essential to the public welfare." (*Little* v. *Banks*, 85 N. Y. 263, 264.)

concerned with the status of highway commissioners before the law, nor with their general powers and duties. It is presently sufficient to say that by law the power to give the consent under which the defendant acted was deposited with the commissioners, and as it resided with them, they were the persons and the only ones who could give it. All of the consents which were obtained would have

Now as to what the contracts, or any of them which may govern, actually provide in regard to fare and transfers.

On the argument defendant's position was essentially based on the assertion that the various local authorities had undertaken to regulate the fare beyond their own territorial jurisdiction. The stress of counsel's contention was that the village trustees, highway commissioners and other officials had attempted to prescribe and regulate the fare beyond the limits of their respective authority.

Of course if I am right in the preceding remarks as to the validity of these obligations as covenants undertaken by the defendant itself in the contract executed by it, then the objection loses its fore. *It is not a question of what the authorities could undertake to impose, but what the company could undertake to do.* If the company could contract in that regard, it could do so as to all or any part of its road. It would make no difference, for instance, on what part of the road, or between what points, its contract to carry for a given fare was entered into by the company. The agreement might be between points or termini in one or several townships or villages.

The court, however, suggested that a stronger argument in favor of the defendant could perhaps be rested on the ground that whatever the general belief as to the provisions in these contracts, some of them (to wit, the printed village contracts in evidence) might be construed as failing to express the obligation to carry for the five-cent fare beyond the village limits. It might be true that the intention of the parties was to secure a five-cent fare not only over defendant's railroad but still more, over some connecting roads of other companies, for the purpose of reaching a ferry and creating an extensive plan of transfers at a fixed fare.

The question would still remain whether the phraseology as finally embodied in the contracts effected the supposed result. There is force in the contention of counsel for plaintiff that any different construction might in great part render purposeless the long provision adopted in the village contracts and particularly those portions of it in relation to transfers. The statute (§ 101, Railroad Law, as amd. by Laws of 1892, chap. 676) already provided that within the boundaries of incorporated villages no greater charge than five cents could be made. The 12th clause in the printed village contracts seems to be a very elaborate contrivance if it only was intended to mean what was already secured by law.

Looking to the 2d and 3d clauses in the New Brighton and Edgewater contracts, it is evident that an extensive district was contemplated to secure access to a ferry for all street railroads at a single fare, although possibly coming from other jurisdictions, and that transfers to and from other railroads were expressly stipulated. The expression " transfers " is clearly meaningless excepting it be

been ineffectual to authorize the construction of the road if their
consent had been withheld. Nothing in the Highway Law (Laws
of 1890, chap. 568) operates to destroy the authority vested in the
commissioners, for reasons already assigned. It may be conceded
that no authority exists to exact an unreasonable requirement as a
condition of granting consent to construct a railroad and where an act

---

for the same given fare. Anybody could "transfer" in the physical sense with-
out that provision by paying a fresh fare. However, whatever may have been
represented or intended, I cannot say that the 12th clause of the village con-
tracts as worded, effects the supposed result as to the amount of the fare except
within the village limits. The contract does contain clear provisions of common
use and trackage, and conditions as to transfers and as to fare, but the latter,
that is, as to the amount of the total fare, seem to be limited to points within the
respective villages. This is in regard to the two village contracts. I have said
so much only because of the specific questions submitted by counsel in the
stipulation.

But it is not necessary to decide that point. If any one contract covers this
case that is enough. It is sufficient to say that the Southfield contract is clear
and explicit and leaves no room for doubt as to the agreement of the company so
far as this case is concerned.

It provides as follows:

"*Seventh.* It is further agreed that the fare charged by said Railroad Company
shall not exceed five cents between any points within said Town; and, further,
that the fare between Richmond and St. George, and intermediate points on the
Company's line, shall be five cents; and the Company agrees to furnish transfers
to any of its connecting lines through the Clove Road from any points in the
within grant or route for a single fare of five cents."

Plaintiff became a passenger on defendant's car in the former town of South-
field. He paid the five cents fare on such car. Pursuant to the company's
instructions, and by direction of the conductor, he alighted at Grant City, in
said town. A transfer was refused under orders of the company, and under the
stipulation it is conceded that placards in the cars announced that no transfers
would be given. Plaintiff, at the place of such ordered alightment (the said
Grant City), boarded the next connecting car of defendant going to the Clove
road and Prohibition Park. By like direction of the company, the conductor
exacted a new fare of five cents, which plaintiff paid under protest and under
threat of ejectment.

All this appears to fall clearly within the provisions of the Southfield contract.
The Middletown contract effects substantially the same result.

I hold as matter of law that the exaction was in violation of the express cov-
enant of the Southfield contract; that this contract was valid and is enforcible
in that respect by the plaintiff in this action.

The plaintiff is, therefore, entitled to the recovery of the additional five cents
fare thus illegally charged.

Judgment for plaintiff for five (5) cents and costs.

provided the conditions upon which the consent should be granted, it is probable that others might not be added. Illustrations of this rule are found in. *Matter of Kings. Co. El. R. R. Co.* (105 N. Y. 97) and *Beekman* v. *Third Avenue R. R. Co.* (153 id. 144). But conditions which are for the benefit of the public, which are proper in character, and are not prohibited either actually or explicitly, are properly exacted. (*People ex rel. West Side St. R. Co.* v. *Barnard*, 110 N. Y. 548; *Peekskill R. R. Co.* v. *Village of Peekskill*, 21 App. Div. 94.) Section 93 of the General Railroad Law, as amended by Laws of 1892, chapter 306, requires that the consent when given shall provide for but one fare over the proposed line of road. While such provision is not controlling of the present question, yet it indicates clearly that the condition imposed was in harmony with the spirit of the Railroad Law, and was of such a character as it was proper to exact. How far the contract is operative as to carriage upon the entire line, it is not now necessary to say. There was clear violation of its provisions in the present case, and for that reason the judgment should be affirmed.

All concurred.

Judgment of the Municipal Court affirmed, with costs.